IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL ANNE MCALLISTER | : |
| Plaintiff, | : CIVIL ACTION |
| v. | : No.: |
| OCWEN LOAN SERVICING, LLC, | : **JURY TRIAL DEMANDED** |
| Defendant. | : |

# COMPLAINT

## INTRODUCTION

1. This action is brought by Michael Anne McAllister, against Ocwen Loan Servicing, LLC (hereinafter, "Ocwen" or "Defendant") for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq.*; and, the Real Estate Settlement and Procedures Act ("RESPA") 12 U.S.C. § 2601, *et seq.*

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the federal claims asserted herein pursuant to 28 U.S.C. § 1331 and *Mims v. Arrow Financial Services, LLC*, 132 S.Ct. 740, 747 (2012).

3. Venue is proper in this District Court pursuant to 28 U.S.C. § 1391 in that Defendant conducts business in this District, Plaintiff resides in this District, and a substantial part of the events giving rise to this action occurred in this District.

## PARTIES

4. Plaintiff, Michael Anne McAllister, is an adult individual residing in Delaware County, Pennsylvania.

5. Defendant Ocwen, is a Delaware limited liability company with offices located at 1661 Worthington Road, Suite 100, West Palm Beach, Florida, 33409.

6. The Defendant is a loan servicer and regularly attempts to collect consumer mortgage debts for mortgagees.

## FACTUAL ALLEGATIONS

7. At all times mentioned herein, Defendant, as a limited liability company, acted by and through its officers, directors, managers, agents, servants, contractors, attorneys, third-party vendors, representatives and/or employees.

8. Plaintiff is the owner, subscriber, regular user, and possessor of a cellular telephone with the assigned number ending in "6600".

9. At all times mentioned herein, Defendant used an Automatic Telephone Dialing System ("ATDS"), a Predictive Dialer ("PD") and artificial or pre-recorded voice equipment and services ("APV") to make telephone calls to Plaintiff's aforesaid cellular telephone in an attempt to collect an alleged delinquent mortgage loan debt related to a mortgage loan which was purportedly held by U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR BNC MORTGAGE LOAN TRUST 2007-2 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-2 ("U.S. BANK").

10. At no time herein did Defendant have Plaintiff's prior express consent to call Plaintiff's cellular telephone using an ATDS, a PD, or an APV.

11. To the extent that Defendant alleges it ever had such prior express consent to contact Plaintiff,[1] such consent was verbally revoked by Plaintiff as Defendant was told by Plaintiff to stop calling her. *Gager v. Dell Financial Services, LLC*, 727 F.3d 265 (3d Cir. 2013) (holding that prior express consent under the TCPA can be revoked).

## COUNT ONE
**Violations of the Telephone Consumer Protection Act ("TCPA")**
**47 U.S.C. § 227,** *et seq.*

12. Plaintiffs incorporate the foregoing paragraphs as though the same were set forth fully at length herein.

13. Within the four-year period immediately preceding the filing of this action, Defendant made hundreds, if not a thousand or more, telephone calls to Plaintiff's aforesaid cellular telephone number by using an ATDS, PD and/or APV, all of which violated 47 U.S.C. § 227(b)(1)(A)(iii).

14. Many of the calls made by Defendant to Plaintiffs' cellular telephone occurred multiple times per day.

15. Many times during the aforesaid time period, Defendant called Plaintiff's cellular telephone after which Plaintiff would answer, only to be met with silence and "dead air". Then, after a brief time delay, a live Ocwen representative would connect onto the line and begin to talk.

---

[1] Plaintiff denies such prior express consent ever existed.

3

16. Other times, Plaintiff would answer Ocwen's call to her cellular telephone and hear an artificial or pre-recorded voice before a live representative would come on the line.

17. The aforesaid descriptions of Defendant's calls to Plaintiff's cellular telephone are characteristic and indicative of the use of an ATDS, PD and APV by Defendant in calling Plaintiffs' cellular telephones, all of which are violative under 47 U.S.C. § 227(b)(1)(A)(iii) in this case.

18. Pursuant to 47 U.S.C. § 227(b)(1)(A)(iii), regarding restrictions on the use of automated telephone equipment:

> It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States— (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice … (iii) to any telephone number assigned to a … cellular telephone service …

19. Specifically, the Federal Communications Commission ("FCC"), which, pursuant to 47 U.S.C. § 227(b)(2), has been charged by Congress to promulgate TCPA regulations under its rule-making authority, has defined the terms "automatic telephone dialing system" ("ATDS") and "autodialer" to mean equipment which, (a) has the capacity to store or produce telephone numbers to be called using a random or sequential number generator and (b) to dial such numbers. 47 U.S.C. § 227(a)(1); 47 C.F.R. 64.1200(f)(2).

20. Further, the definition of an ATDS includes the use of a "predictive dialer." As explained by the FCC:

> A "predictive dialer" is a dialing system that automatically dials consumers' telephone numbers in a manner that "predicts" the time when a consumer will answer the phone and a telemarketer will be available to take the call. Telemarketers use such software programs to minimize the amount of downtime for a salesperson. In some instances, however, no telemarketer is free to take a call that has been placed by a predictive dialer, and the consumer answers the phone only to hear "dead air" or a dial tone, causing frustration. *2003 TCPA Order, 18 FCC Rcd at 14014, 14022, para. 8 n.31*.

21. In ruling that a predictive dialer ("PD") is an ATDS, the FCC stated:

> We believe the purpose of the requirement that equipment have the "capacity to store or produce telephone numbers to be called" is to ensure that the prohibition on autodialed calls not be circumvented. Therefore, the Commission finds that a predictive dialer falls within the meaning and statutory definition of "automatic telephone dialing equipment" and the intent of Congress. *2003 TCPA Order, 18 FCC Rcd. 14014, 14092-14093*.

22. Given Plaintiff's aforesaid experiences answering the calls made to her cellular telephones by Defendant, it is apparent that Defendant did in fact "store" Plaintiff's cellular telephone number in its database and did in fact use an ATDS to call Plaintiffs' cellular telephones in violation of 47 U.S.C. § 227(b)(1)(A)(iii).

23. Plaintiff's claim that Defendant did in fact call her cellular telephone using an ATDS is further corroborated by outside sources as well.

24. In September 2012, *Morningstar Credit Ratings, LLC* reported on its Operational Risk Assessment of Ocwen Loan Servicing, LLC. As of the time of this Complaint, the full report can be found on Ocwen's own website at:

http://www.ocwen.com/docs/Morningstar-Sept-2012.pdf

5

25. While assessing Ocwen's operational infrastructure, *Morningstar* reported that Ocwen does in fact possess and utilize autodialing technology for its outbound collection calls. See Exhibit A, at 1, 13, 16 and 17.

26. Further, job posting advertisements placed by Ocwen seeking to fill its "Customer Care Coordinator" positions provide additional corroboration of Ocwen's use of an ATDS when making outbound collection calls. See Exhibit B.

27. Ocwen's job postings specifically reference making contact with customers through the use of "outbound dialer campaigns." Id.

28. Ocwen's job postings also reveal the existence of "call center metrics" which presumably would dictate and document the number of calls made to Plaintiff - whether completed or not – and which information would be incorporated into its "department statistics." Id.

29. In fact, another job posting by Ocwen Financial Corporation, an overseas affiliate of Ocwen, seeks to fill the loan servicing "Customer Care Coordinator" position with candidates that can make "proficient use of an autodialing system to maximize effectiveness and increase contact ratios", "make the prescribed number of contacts during the daily work schedule", and "[log] all borrower contacts into the loan servicing system". See Exhibit C.

30. Further, as recently as September 23, 2015, a federal jury in Drew v. Ocwen Loan Servicing, LLC, U.S.D.C., No. 14-cv-0369 (Middle District of Florida) found that Ocwen willfully or knowingly violated the TCPA by placing 218 calls to a

party's cell phone; thus, acknowledging Ocwen's use of an ATDS in its collection activities. See Exhibit D, (Document 102).

31. Based on this verdict, the court entered judgment against Ocwen in the amount of $327,000, representing the maximum statutory penalty of $1,500 per call under the TCPA. See Exhibit E, (Document 103).

32. None of the autodialed calls made by Defendant to Plaintiff's cellular telephone was for emergency purposes.

33. Defendant's continual and violative conduct in making calls to Plaintiff's cellular telephone was knowing or willful in that,

(a) Defendant took purposeful affirmative steps to ascertain Plaintiff's cellular telephone number and then used an artificial or pre-recorded voice and/or an autodialer to make calls to that number in violation of the TCPA,

(b) Defendant totally disregarded Plaintiff's request to stop calling her;

(c) Defendant has a business model and practice (as illustrated, at least, by the aforesaid *Morningstar* report to make use of ATDS technology in disregard of the TCPA and FCC Rules and Regulations.

WHEREFORE, Plaintiff demands judgment against Defendant,

    a)    in the amount of $1,500.00 for each call made in knowing or willful violation of the TCPA, pursuant to 47 U.S.C. § 227(b)(3) as trebled and permitted by statute;

    b)    in the amount of $500.00 for each call made in violation of the TCPA, pursuant to 47 U.S.C. § 227(b)(3)(B);

    c)    declaring Defendant to be in violation of the TCPA and enjoining Defendant from committing any further violations of the TCPA, pursuant to 47 U.S.C. § 227(b)(3)(A);

    d)    such other relief as the Court deems just and proper.

**COUNT TWO**
**Violations of the Real Estate Settlement and Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et seq.***

34. Plaintiff incorporates the foregoing paragraphs as though the same were set forth fully at length herein.

35. As a result of Plaintiff falling behind on her mortgage payments, Defendant Ocwen, as servicer for the aforementioned mortgagee, U.S. BANK, authorized the initiation of a mortgage foreclosure action which was filed against Plaintiff on February 27, 2015 in the case styled as: <u>U.S. BANK v. Michael Anne McAllister</u>, Delaware County, C.C.P., Docket No.: 2015-001858. <u>See Exhibit F</u> (Docket Entries).

36. Judgment by default was entered against Plaintiff on April 27, 2015 after which her residence was scheduled for a Sheriff's Sale on August 21, 2015. <u>See Exhibit G</u>.

37. Then, on June 3, 2015, a representative from Ocwen by the name of Lawrence contacted Plaintiff by telephone.

38. Lawrence verbally outlined to Plaintiff some loss mitigation options that may be available to stop the scheduled Sheriff's Sale.

39. Lawrence then assigned Plaintiff to another Ocwen representative by the name of Justin Matthews who was to be Plaintiff's "counselor" and who would be available to discuss available loss mitigations options in more detail.

40. Lawrence told Plaintiff that Justin would call her on June 5, 2015 at 1:30 p.m. regarding these loss mitigation options.

41. In anticipation of the call, Plaintiff went to her accountant's office and awaited the scheduled call.

42. When the call came in, the Ocwen representative on the line was not the assigned Justin Matthews, but, instead, another Ocwen representative by the name of Sanjay.

43. A conference call then took place between Sanjay and Plaintiff along with her accountant, Robert Kratz.

44. Plaintiff told Sanjay that she wanted to get a loan modification, which was one of the options Ocwen told her might be available.

45. In response, Sanjay instructed Plaintiff to provide Ocwen a financial statement for March, April and May 2015 with respect to her business (IVC Infusions LLC).

46. Accordingly, Plaintiff requested and paid her accountant to prepare the requested financial statement and email it to Ocwen.

47. On June 12, 2016, Plaintiff's accountant then emailed to Ocwen Plaintiff's financial statement for the first five months of 2015. See Exhibit H (redacted copies of same).

48. On that same day, Plaintiff called for Ocwen's Justin Matthews to follow up on her loan modification request; however, Plaintiff was given over to Ocwen representative Khkalid.

49. Khkalid then went on to say that the financial statement Plaintiff provided to Ocwen in connection with the loan modification request showed "very less" and was not acceptable.

50. Plaintiff asked Khkalid what he meant by "very less", but Plaintiff was not able to obtain an intelligible response to her inquiry.

51. Plaintiff then asked where her supposed assigned counselor, Justin Matthews was, after which Plaintiff was given another date of June 21, 2015 to speak with Justin.

52. In the meantime, Ocwen unexpectedly called Plaintiff on June 18, 2015 asking Plaintiff what she was going to do given in light of the upcoming August 21, 2015 Sheriff's Sale.

53. Plaintiff said she was supposed to speak to Justin on June 21, 2015 and had requested a loan modification.

54. Plaintiff then called for Justin on June 21, 2015 after he failed to call as scheduled; Plaintiff was told that her phone appointment was scheduled for June 23, 2015, despite the fact that Plaintiff had been previously told the date was June 21, 2015.

55. June 23, 2015 came and went, without any call from Justin.

56. Despite all the above, Plaintiff never once was able to speak with her supposed assigned counselor, Justin Matthews.

57. Moreover, Plaintiff never received any written decision or correspondence about her loan modification request despite her complying with Ocwen's request for her financial information.

58. In the meantime, notwithstanding the above, the scheduled August 21, 2015 Sheriff's Sale of Plaintiff's residence still kept on track without interruption.

59. Despite Plaintiff's good faith attempts to communicate and cooperate with Ocwen to obtain a loan modification, Plaintiff was unable to obtain same.

60. Plaintiff then had no alternative but to reinstate her loan, which she did on July 24, 2015 in order to avoid the scheduled Sheriff's Sale and save her home.

61. Plaintiff's above-referenced mortgage is and was, at all relevant times hereto, a federally related mortgage loan within the meaning of RESPA, 12 U.S.C. § 2602(1) in that:

    a) it is secured by a first or subordinate lien on residential real property designed principally for the occupancy of from one to four families, and

b) it was made in whole or in part by a lender the deposits or accounts of which are insured by an agency of the Federal Government, or was made in whole or in part by a lender which is regulated by an agency of the Federal Government.

62. Plaintiff is and was, at all times relevant hereto, the borrower on the aforesaid mortgage loan within the meaning of RESPA, 12 U.S.C. § 2605(f).

63. Defendant Ocwen is and was, at all times relevant hereto, the servicer of Plaintiff's aforesaid mortgage loan within the meaning of RESPA, 12 U.S.C. § 2605(i)(2).

64. Pursuant to RESPA, 12 U.S.C. § 2605(j)(3), the Consumer Financial Protection Bureau, ("CFPB") - which was formed under the authority of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Pub.L. 111-203, H.R. 4173) (July 21, 2010), 12 U.S.C. § 5301 – promulgated Mortgage Services Rules that went into effect on January 14, 2014.  12 C.F.R. Part 1024 (Regulation X).

65. Pursuant to RESPA, 12 U.S.C. § 2605(k)1(E), servicers are required to comply with the regulations promulgated by the CFPB.

66. One of those regulations, 12 C.F.R. § 1024.41(b), governs procedures on loss mitigation applications submitted by a borrower to a servicer.

67. Pursuant to 12 C.F.R. § 1024.31, a "loss mitigation application" is defined as "an oral or written request for a loss mitigation option that is accompanied by any information required by a servicer for evaluation of a loss mitigation option."

68. Accordingly, in this case, Plaintiff's request a loan modification coupled with her submission of the financial statement requested by Ocwen constitutes a "loss mitigation application" as defined by § 1024.31.

69. Once Plaintiff's loss mitigation application was submitted to Ocwen, as it was on June 12, 2015, Ocwen was required, pursuant to 12 C.F.R. § 1024.41(b)(2)(B), to notify Plaintiff, in writing, that (a) it received the loss mitigation application, and, (b) state whether the loss mitigation application was complete or incomplete.

70. The aforesaid § 1024.41(b)(2)(B) is applicable in this case in that, as prescribed by 12 C.F.R. § 1024.41(b)(2), the loss mitigation application was submitted by Plaintiff to Ocwen more than forty-five days before the foreclosure sale which was scheduled for August 21, 2015.

71. Ocwen failed to comply with the aforesaid notice requirements in violation of 12 C.F.R. § 1024.41(b)(2)(B).

72. Ocwen also violated 12 C.F.R. § 1024.41(d) in that Ocwen failed to send Plaintiff written notice of, (a) the specific reasons for Ocwen's denial relevant to any trial or permanent loan modification, and, (b) Plaintiff's right to appeal.

73. Consistent with 12 C.F.R. § 1024.41(a), Defendant's aforesaid RESPA violations are enforceable through a private right of action pursuant to RESPA, 12 U.S.C. § 2605(f).

74. As a result of Ocwen's aforesaid RESPA violations, Plaintiff suffered actual damages including emotional distress, loss of sleep, anxiety, fear, stress, inconvenience, lost time from work, accountant's fees and out-of-pocket expenses.

75. As a result of Ocwen's aforesaid RESPA violations, Plaintiff, in addition to the aforesaid actual damages, is entitled to statutory damages in an amount up to $2,000 in that Defendant's conduct is part of a pattern or practice of non-compliance, plus attorney's fees and costs, pursuant to 12 U.S.C. § 2605(f).

76. Such pattern and practice is evident by the recent April 28, 2016 finding of Joseph A. Smith, Jr. who oversees the National Mortgage Settlement[2] of which Ocwen is and was a party; wherein, Mr. Smith found Ocwen systematically failed to meet its obligations to provide proper loan modification denial disclosure notices.  See Exhibit I, regarding Metric 31, as excerpted from:

https://www.jasmithmonitoring.com/omso/reports/update-on-ocwens-consumer-relief-and-compliance/ (generally addressing Ocwen's loan servicing failures, including, but not limited to, Ocwen's failure to provide proper loan modification denial disclosure notices).

77. In fact, due to Ocwen's non-compliance in sending required loan modification denial disclosure notices, Ocwen was ordered to suspend proceeding with over 17,000 pending foreclosure cases.

See, e.g., http://www.housingwire.com/articles/36908-ocwen-foreclosures-frozen-after-national-mortgage-settlement-compliance-failure?eid=311684478&bid=1389234

---

[2] *Consumer Financial Protection Bureau, et al. v. Ocwen, et al.*, U.S.D.C., No. 13-cv-2025 (District of Columbia)

WHEREFORE, Plaintiff demands judgment against Defendant for actual damages, statutory damages, attorney's fees and costs pursuant to 12 U.S.C. § 2605(f).

**NOTICE TO PRESERVE DOCUMENTS, RECORDS AND EVIDENCE**

Plaintiff hereby demands the Defendant, its officers, directors, managers, agents, servants, employees, representatives, contractors and/or attorneys preserve any and all evidence that is relevant or related to this litigation, including but not limited to all outbound dialing records and lists, call logs, call records, call detail, call summaries, telephone bills, data compilations, data storage records, dialing or call attempt records, dialing or call completion records, artificial voice records or recordings, pre-recorded voice records or recordings, computer records, electronic records or any other documents or data that in any way relate to or reference communications or telephone calls made, or attempted to be made or dialed to Plaintiff, irrespective of whether the communication or telephone call was completed.

## **JURY DEMAND**

Plaintiff hereby demands trial by jury on all triable claims.

                              LAW OFFICE OF JOSEPH M. ADAMS

                              By:    /s/ Joseph M. Adams
                                        Joseph M. Adams, Esq.
                                        Attorney ID: 58430
                                        200 Highpoint Drive
                                        Suite 211A
                                        Chalfont, PA  18914
                                        Tele:  215-996-9977
                                        Attorney for Plaintiff